UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—---------------------------------------x
RONALD DAVIDSON, Plaintiff,

   -- against --

OFFICE OF COURT ADMINISTRATION;
JOSEPH ZAYAS;                   1:22-cv-08936
LAWRENCE MARKS;             -PGG-VF
JOHN DOE1;
JOHN DOE2;
JOHN DOE3;                 AFFIRMATION RE
JOHN SULLIVAN;            MOTION PER
ALIA RAZZAQ;               FRCP RULE 54(b)(1)(B)
TRACEY FERDINAND;       RE ECF NO. 148
NORMA JENNINGS;
TRAVIS ARRINDEL;
VANESSA FANG;
FRANCES ORTIZ;

THOMAS DINAPOLI;
KIMBERLY HILL;
DAWN PINNOCK;

PATRICK KEHOE, Defendants

—---------------------------------------x


Ronald Davidson affirms under federal penalties of perjury:


1. This affirmation in support of my Motion per Federal Rules of Civil Procedure (FRCP)

Rule 54(b)(1)(B) is necessary because the Judicial Conference of the United States

(JCUS), the Judicial Council of the Second Circuit (Judicial Council), this Court, the

scofflaw Defendants and others, including the scofflaw New York City (NYC) Human

Resources Administration (HRA)/Department of Social Services (DSS)/Department of

Homeless Services(DHS), have together amalgamated "intentional discrimination" and

"deliberate indifference" in a cruel-but-not-unusual process of US/NY/NYC-contrived

impossibility of performance targeting me in specific; and in this context, the scofflaw

entities and people, acting individually and together, chose affirmatively to do what

they did because of what they knew — or despite of what they knew or should have

known — about my disabilities which were made worse by viral infection during the

worldwide pandemic. — see (#1) Exhibit 1: June 5, 2023 Transcript in *Davidson v*

*OCA* at p. 2, lines 11-23 in the context created by (#28) Exhibit 28: paragraph 25 in

the Stipulation of Settlement (ECF No. 55) in *Butler v. City of New York*,

1:15-cv-03783-RWS-JLC (SDNY July 17, 2017) [interactive process], e.g.,

> 25. <u>RA</u> [Reasonable Accommodation (RA)] <u>Process</u>. The DHS RA **process will**
>
> **be interactive**, *and DHS will consider RA requests on an individualized basis*. A
>
> DHS Client will not be required to specify any particular words or language to
>
> request an RA or to have an RA granted … [and] DHS will give primary
>
> consideration to the individual's preference …. [emphasis with <u>underlining</u> in
>
> original; emphasis added with *italics* and **bold**]


2.  In my many frustrated attempts to seek meaningful accommodations for my

disabilities, I independently informed this Court, the scofflaw Defendants and other

non-party, non-federal scofflaw recipients of federal financial assistance about my

disabilities, which is what complementary federal, state and municipal disability rights

laws are explicit in requiring me to do; and the presumptive records which the

Defendants and other non-federal recipients of federal dollars have contractually

agreed to create/maintain/produce for federal agency/judiciary examination now

function as probative confirmations that the subsequent actions and inaction of each

fraudfeasor and tortfeasor was more than negligent; and any review by a reasonable

man compels acknowledgement of the cumulative array of evidence-based data which validates my assertions of cruel but-not-unusual patterns and practices which are demonstrably shown to be unlawful. — see ECF No. 141 in *Viera v. City Of New York*-PGG, No. 1:2015-cv-05430-PGG (SDNY September 30, 2018)

> "The standard for intentional violations is 'deliberate indifference to the strong likelihood [of] a violation:' '[i]n the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will." Id. (quoting *Bartlett v. NY State Board of Law Examiners*, 156 F3d 321, 331 (2d Cir. 1998)) (internal citations omitted). "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Duvall v. Cty. of Kitsap*, 260 F3d 1124, 1139 (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2001). "[I]n order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." Id. (citing *Bartlett*, 156 F3d at 331).

3.  Each of the named scofflaw Defendants and intervening scofflaw non-parties are recipients of federal financial assistance; and accordingly, each has willingly and knowingly accepted the continuing burdens and express warranties made unmistakeably plain in contractual covenants prohibiting unlawful discrimination on the basis of disability; and in this way, each has documented the baseline which supports my standing in this action per Section 120 of the Rehabilitation Act

Amendments of 1978, Pub. L. 95-602, 92 Stat. 2982-2983 [PDF pp. 28-29 of 63]

https://www.aucd.org/docs/urc/DD%20Act/DD%20Act%20of%201978.pdf; and these

contractual relationships between non-federal entities and the federal funding streams

encompass

> (a) the State of New York (NY), which is a legally significant beneficiary of
> federal financial assistance; and

> (b) each of the indirect recipients of federal financial assistance from NY
> pass-through entities, including funding streams feeding the New York Legal
> Assistance Group (NYLAG); and

> (c) the OCA and such agents as are named as Defendants, which are each
> legally significant beneficiaries of federal financial assistance; and

> (d) the City of New York (NYC), which is a legally significant beneficiary of
> federal financial assistance; and

> (e) each of the indirect recipients of federal financial assistance from NYC
> pass-through entities, including funding streams feeding NYLAG and the NYC
> Coalition for the Homeless (CFTH); and

> (f) Patrick Kehoe (Kehoe) in his fiduciary role as executor of the estate of the
> late Ursula Beauseigneur, which is a legally significant beneficiary of federal
> financial assistance; and

> (g) the Rivercross Tenants' Corporation (Rivercross), which is a significant
> beneficiary of federal financial assistance. — see property records for the land
> parcel in New York County at Block 1373, Lot 40; and see Ground Lease at Block
> 1373, Lot 50 (Reel 419/1795) re anti-discrimination on p. 42 (419/1836); and
> see *Tudor v. Whitehall Central School District*, 23-665-cv (2CA March 25, 2025),

citing *Hopman v. Union Pac. R.R.*, 68 F.4th 394, 401-02 (8CA 2023) [failure to accommodate claims require a "fact- and context-specific" inquiry]

**Impossibility of performance**.

4.  With the perverse-but-effective collusion, assistance and imprimatur of this US District Court, the scofflaw Defendants and the scofflaw NYC HRA/DSS/DHS and scofflaw NYC contractors have been enabled, aided and perversely encouraged to act unlawfully — targeting the Plaintiff's disabilities for the purpose of

    (a) blocking and/or delaying his process of research, drafting, editing and submitting pleadings and otherwise participating in the program of the federal judiciary; and

    (b) retaliating because of his temerity in merely trying to access the relief and remedies of the federal judiciary; and

    (c) causing repeated/cumulative impossibility of performance in the difficult process of fulfilling his *pro se* litigant duties, obligations and responsibilities

        (i) in *Davidson v HHC*, 1:22-cv-00764-AS-SA; and

        (ii) in this action, *Davidson v OCA*; and

        (iii) in *Davidson v Judicial Council of the Second Circuit*, 1:25-cv-01226-LTS; and

        (iv) in his submitted original jurisdiction Petition for *Certiorari* in the US Supreme Court; and

        (v) in the submitted, but undocketed *Davidson v City of New York* — see *Harlow v. Fitzgerald*, 457 U.S. 800, 818-819 (1982) [official is "expected

to know that certain conduct would violate statutory or constitutional

rights"]; and see *Hamer v City of Trinidad*, 924 F3d 1093 (10th Cir 2019)

[continuing violation vs repeated violations]


5. The required compliance records which are contractually mandated for all recipients

of federal financial assistance — not excluding NY *et al.*, OCA *et al.*, NYC *et al.*, NYLAG

*et al.*, CFTH *et al*., Kehoe and Rivercross — confirm that the baseline gravamen of my

many serial accommodation requests were unlawfully denied and my disabilities were

unlawfully weaponized to cause harms and irreparable damages affecting me; and

each of the entities and individuals identified above are demonstrably shown to have

been ready, willing and able to act repeatedly

(a) in violation of the Rehabilitation Act of 1973 (RA), Pub. L. 93-112, 87 Stat.

355; and

(b) in violation of the Housing Act of 1937, as amended by

(i) Section 109 of the  Community Development Act of 1974, (HCDA) Pub.

L. 93-383, 88 Stat. 633; and

(ii) Section 507 of the Quality Housing and Work Responsibility Act of

1998 (QHWRA), Pub L 105-276, 112 Stat 2461, 2524-2525; and

(c) in violation of the Civil Rights Restoration Act of 1987 (CRRA), Pub. L.

100-259, 102 Stat. 28; and

(d) in violation of Title II and IV of the Americans with Disabilities Act of 1990

(ADA), Pub. L. 101-336, 104 Stat. 327; and

(e) in violation of Section 1557 of the Patient Protection and Affordable Care Act

of 2010 (ACA), Pub. L. 111-148, 124 Stat. 109–1025, codified at 42 USC

§18116. — see ADA legislative history archived in Federal Depository microfiche set, SUDOC No. Y1.L11/4.S.HRG. 101-159, re Sen. Kennedy ["***the combination of different ... laws  ... in order to achieve a public policy outcome*** …. I think we are entitled to have learned from past experience.  I think that is part of the legislative process.  *We have learned what has been effective*."] [emphasis added with *italics* and **bold**]; and *Hamer, supra* which establishes a federal common law context for the Defendants' heedless violations of the statutory and national anti-discrimination policy made specific in regulations of

(a) the US Office of Management and Budget (OMB) at 2 CFR §200.300(a); and

(b) the NYC Administrative Code (NYC Code) at §8-107(28)(b) ["unlawful discriminatory practice … *to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time* with a person who has requested an accommodation"] [emphasis added with *italics* and *underlining*]

NYC Code §8-102.

… The term "cooperative dialogue" means the process by which a covered entity and a person entitled to an accommodation, or who may be entitled to an accommodation under the law, engage in good faith in a written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a

requested accommodation; and the difficulties that such potential

accommodations may pose for the covered entity.


**Invidious acts = weaponizing disability in 2023**


6. On September 5, 2023, proceedings were scheduled in *Kehoe v.*

*Davidson*, L&T Index No. 072772-NY-19; and before this pre-trial

conference started, NYLAG's Senior Supervising Attorney Mark Hess walked over to

me where I  was seated inside a courtroom of the New York County Courthouse in

lower Manhattan; and he asked me to speak with him in the hallway. — see (#2)

Exhibit 2: ECF No. 52 in *Davidson v OCA*; and see (#29) Exhibit 29: September 5,

2023 Transcript in *Kehoe v. Davidson*, L&T Index No. 072772-NY-19


7. I asked Mr. Hess why he told my court-appointed Guardian ad litem (GAL) that I

was mentally ill; and he said that he reported what was written in the NYLAG case file.

— see (#2) Exhibit 2, *supra* [ECF No. 52]


8. In response, I stated that my extensive medical records document no diagnosis of

mental illness. — see (#2) Exhibit 2, *supra* [ECF No. 52]


9. Mr. Hess then said that he didn't know whether or not the mental illness label was

correct; and he added, "I only know what Matthew Chenoweth wrote in the NYLAG

record and what I observed in court." — see (#2) Exhibit 2, *supra* [ECF No. 52]

10. The purposeful malice made plain in this strange conversation was continuing when we saw GAL William Gilinsky walking toward us; and my appreciation of my peril was undiminished when the GAL announced that we were wanted by Housing Court Judge Vanessa Fang. — see (#2) Exhibit 2, *supra* [ECF No. 52]

11. As the three of us walked towards the courtroom door, I told Mr. Gilensky that he'd proven himself unfit to be a GAL because

(a) he did not inform me before reaching out to NYC Adult Protective Services (APS), ostensibly on my behalf; and

(b) his report to APS created a documented an unlawfully discriminatory label of mental illness without a lawfully valid reason. — see (#2) Exhibit 2, *supra* [ECF No. 52]

12. Scofflaw Defendant Gilinsky's immediate reaction was dramatic, intense, eerie; and I observed that

(a) he did not ask any of the questions a reasonable man would have asked; and

(b) he did become indignant, offended, angry — establishing himself as the sole focus of attention to the exclusion of all else; and

(c) he did ln no way acknowledge or address the gravamen of my factual statements which were brief, specific and consequential. — see (#2) Exhibit 2, *supra* [ECF No. 52]

13. In the pre-trial conference "event", Mr. Gilinsky urgently spoke out to frame what he defined as the primary issue at hand; and he said, "Mr. Davidson called me incompetent." — see (#2) Exhibit 2, *supra* [ECF No. 52]; and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]

14. In an attempt to draw attention to what I meant when I used the word "unfit," I tried to proffer evidence; however, my words only succeeded in causing a silent blank stare from sofflaw Defendant Fang; moreover there was no responsive utterance, and the absence of words is meaningful in this perverse context. — see (#2) Exhibit 2, *supra* [ECF No. 52]; and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]

15. I attempted to explain that Mr. Gilinsky had defined himself as "unfit"

    (a) when his words created an unlawfully discriminatory APS record that I have a mental illness; and

    (b) when his words and actions created unlawfully false APS records without valid documentary support of any kind. — see (#2) Exhibit 2, *supra* [ECF No. 52]; and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]

16. Scofflaw Defendant Fang refused to acknowledge

    (a) my timely proffer of evidence to establish/confirm that Mr. Gilinsky made himself disqualified to continue to function as an appointed agent of the NY Unified Court System (UCS); and

(b) my prudent acknowledgement that Mr. Gilinsky's unlawful discriminatory misconduct

> (i) created significantly harmful consequences in 2023; and
>
> (ii) established a likelihood of predictably greater harms and irreparable injuries in the foreseeable future; and
>
> (iii) functioned as a constitutionally prohibited barrier to my meaningful access to the program and benefits of the UCS, which is a NY government entity/program funded in part with federal financial assistance inside a NYC-owned courthouse which is funded in part with federal dollars. — see (#2) Exhibit 2, *supra* [ECF No. 52] and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]; and see *Harlow, supra* at 818-819; and see and see *Henrietta D. v. Bloomberg*, 331 F.3d 261, 268 (2d Cir. 2003) ["chronically and systematically failing to provide plaintiffs with meaningful access"]

17. Scofflaw Defendant Fang did not acknowledge or respond to the gravamen of my statement of facts nor to the predictable consequences I foresaw; and again, my words only succeeded in causing a strained silence and a blank stare; and then, after a prolonged pause, she attempted to confuse the issue, to distract me and to procedurally pivot with shocking and legally significant admission against interest when she said, "This is why you have a GAL." — see (#2) Exhibit 2, *supra* [ECF No. 52]; and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]; and see *Harlow, supra* at 818-819; and see *Adickes v. S. H. Kress Co.*, 398 US 144, 168 (1970) ["practices . . . so permanent and well settled as to

constitute a 'custom or usage' with the force of law"]; and see *Simon v. Craft,* 182 US 427, 436 (1901) [essential elements of due process = "In determining  whether such *rights were denied* <u>we are governed by</u> *the substance of things, and not by mere form*"] [emphasis added with *italics* and <u>underlining</u>].

18. Then scofflaw Defendant Fang affirmatively dismissed my critical request for er help in mitigating the harm caused unlawful discriminatory misconduct of a court-appointed UCS agent; and she followed up by re-framing the issue at hand — asking me if I was willing to work with Mr. Gilinsky. — see (#2) Exhibit 2, *supra* [ECF No. 52]; and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]; and see *Adickes, supra* at 168; and see *Simon, supra* at 436

19. In reply, I tried to explain that my  communication disabilities made it essential for Mr. Gilinsky to acknowledge my need for accommodations like the ones suggested in the baseline neurologist's letter which was was timely submitted in person by me to Senior Housing Court Clerk White in the early afternoon of August 8, 20<u>22</u>; and I reported that Mr. Gilinsky did not acknowledge an August 5, 20<u>23</u> e-mail in which I explained this in writing. — see (#2) Exhibit 2, *supra* [ECF No. 52]; and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]; and see *Adickes, supra* at 168; and see *Simon, supra* at 436

20. Mr. Gilinsky then interrupted to say he had not received the e-mail; but the GMail archive of this specific electronic document confirms that my writing was, in fact, received by the e-address to which he provided for me to use. — see (#2) Exhibit 2,

*supra* [ECF No. 52]; and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]; and see *Adickes, supra* at 168; and see *Simon, supra* at 436

21. The transcript of the audio record of this post-truth/"alternate reality" performance "event" on September 5, 2023 confirms that I then tried to proffer documentary proof that my e-mail message was indeed sent and received; and nevertheless, my words only succeeded in causing a silence and a hostile stare from scofflaw Defendant Fang; and I was made to feel as if I had said nothing at all. — see (#2) Exhibit 2, *supra* [ECF No. 52]; and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]; and see *Adickes, supra* at 168; and see *Simon, supra* at 436

22. Then scofflaw Defendant Fang asked Mr. Hess if he had a copy of the letter from Dr. Chou; and when Mr. Hess said "yes," she asked him to forward a copy of the letter to Mr. Gilinsky; and Defendant Fang's unforced-error showed that she was either unaware or unlawfully feigning to be unaware that this critical document from Dr. Janice Chou was, in fact, redundantly inserted into her bench records by one of her predecessors in th housing court process. — see (#2) Exhibit 2, *supra* [ECF No. 52]; and see (#29) Exhibit 29, *supra* [Transcript in *Kehoe*, L&T Index No. 072772-NY-19]; and see *Adickes, supra* at 168; and see *Simon, supra* at 436

23. After this difficult post-truth/"alternate reality" performance "event", Mr. Hess and Mr. Gilinsky and I happened to be together in the hallway as we left the courtroom;

and then they surprised me with an unlawfully discriminatory tag-team ambush. —
see (#2) Exhibit 2, *supra* [ECF No. 52]

24. The Hess/Gilensky confrontation scenario was predictably overwhelming because
they knew what I had explained about the well-documented, specific and interrelated
vulnerabilities caused by my executive function and communication-related disabilities
which were made worse during the pandemic. — see (#2) Exhibit 2, *supra* [ECF No.
52]

25. In the angry, loud, fast-talking context Hess/Gilinsky unlawfully initiated, three
key points remain clear in my memory:

> (a) when Mr. Hess said NYLAG is not required to make any accommodations for
> my communication-related disabilities, I looked directly into his eyes as I said,
> "no;" and

> (b) when Mr. Gilinsky raised the volume of his voice at the same time as he took
> several steps towards me, I "read" and reacted to his intentionally intimidating
> tone of voice and his body language as he said, "I don't know what reasonable
> accommodation means"; and I looked directly into his eyes as I said said, "no;"
> and

> (c) then I took a step back from both of them. — see (#2) Exhibit 2, *supra* [ECF
> No. 52]

26. After silently studying the aggressive, cpntorted faces of both self-defined
adversaries, I said "no, no, no"; and then, I slowly retreated from their hostility and

their purposeful plan to create a difficult cognitive cascade failure. — see (#2) Exhibit 2, *supra* [ECF No. 52]

27. Both men called out to me in the nearly empty hallway; and as I walked away slowly, I did not react to their words because I believed that this is what any reasonable man would have done. — see (#2) Exhibit 2, *supra* [ECF No. 52]

28. In the context established/alleged in paragraphs 1-27 above, my alarm about the dangers of "significant current and future consequences" in paragraph 16 above was proven to be prescient three years later in September 2025 when DHS contractor Quinton Nelson explained to me that his job required him to accept that the NYC online records about me are irrefutably valid

(i) despite anything I might say; and

(ii) despite any contradictory documentary evidence I had presented and he had accepted — see online NYC documentary corroboration of (#2) Exhibit 2, *supra* [ECF No. 52]  which establishes a context for (#3) Exhibit 3, *supra* at paragraphs 28 and 29 in the Settlement Agreement (ECF No. 67) in *Butler, supra*

28. Disability-Related Information. DHS will require disability-related information from Class Members …. [emphasis with underlining in original]

29. When requesting disability-related information, DHS staff will also (a) *ascertain whether there is **existing information in DHS' possession*** that may suffice to grant the requested accommodation, and (b) make best efforts to determine whether there is ***existing information in***

***HRA's possession*** which may suffice to grant the requested accommodation. Simultaneous with any request for disability-related information from a Class Member requesting an RA, and *with the Class Member's consent, to the extent feasible,* **DHS will make best efforts to determine whether there is likely existing information in other databases that DHS can access through inter-agency agreements or other means** that may support the request for the accommodation, and if so, DHS will make best efforts to obtain such information. To the extent that DHS obtains relevant disability information as described in (a) and (b) above, DHS will inform the Class Member so as to avoid unnecessary duplicative documentation. [emphasis with <u>underlining</u> in original; emphasis added with *italics* and **bold**]

**Invidious actions = weaponizing disability in 2024-2025**

29. In the contexts established/alleged in paragraphs 1-28 above and in support of the request for reconsideration of ECF No. 148 per FRCP Rule 54(b)(1)(B) and FRCP Rule 9, the critical facts and law documented in Exhibits 4-27 below were timely submitted to scofflaw  agents of NYC and its DHS contractors as part of an anticipated interactive process made clear and explicit in paragraphs 21-36 and 40 of the Settlement Agreement (ECF No. 67) in *Butler, supra*, e.g.,

    #(4) Exhibit 4: Form DHS-13 (E) 08/04/22 (page 1 of 3) LLF re disability accommodation; also identified as ECF No. 110-1 in *Davidson v. OCA*, 1:22-cv-08936-PGG-VF (SDNY 10/09/24) re disability accommodation; and

#(5) Exhibit 5: Letters re re disability accommodation Exhibit 3 is true; and

#(6) Exhibit 6: NYC Department of Homeless Services (DHS) notice re Clean Rite

#(7) Exhibit 7: Form DHS-48d(E) 11/30/22 (page 1 of 5) LLF re transfer; and

#(8) Exhibit 8: Letters re adverse effects of disability in transfer; #(9) Exhibit 9: 1st attachment to Ex. 5 = Letter re disability accommodation; and

#(10) Exhibit 10: 2nd attachment to Ex. 5 = same as Ex.1; and

#(11) Exhibit 11: 3rd attachment to Ex. 5 = 49 FR 35724, 35728 (September 11, 1984) re disability accommodation

#(12) Exhibit 12: Letters re 28 CFR §35.164; and

#(13) Exhibit 13: 1st attachment to Ex. 9 = Letter to SDNY judge re disability accommodation; and

#(14) Exhibit 14: 2nd attachment to Ex. 9  = same as Ex. 1; and

#(15) Exhibit 15: 3rd attachment to Ex. 9 = same as Ex. 8 ; and

#(16) Exhibit 16: Letter re 28 CFR §35.164; and

#(17) Exhibit 17: Letters re 28 CFR §35.130 and 28 CFR §§35.160; and

#(18) Exhibit 18: Letter re SDNY; and

#(19) Exhibit 19: 1st attachment to Ex. 15 = Letter to US District Judge Laura Swan; and

#(20) Exhibit 20: 2nd attachment to Ex. 15 = Letter to US District Judge Arun Subramanian; and

#(21) Exhibit 21: 3rd attachment to Ex. 15 = Letter to US Magistrate Judge Valerie Figuredo; and

#(22) Exhibit 22: Letter re communication disabilities; and

#(23) Exhibit 23: attachment to Ex. 19 re assistive aids, services and modifications of procedure, e.g., laptop, internet, desk; and

#(24) Exhibit 24: Letter re executive function disabilities; and

#(25) Exhibit 25: attachment to Ex. 21 re assistive aids, services and modifications of procedure, e.g., plastic baskets

#(26) Exhibit 26: Form DHS-48c(E) 05/24/22 (page 1 of 5) LLF re transfer, significantly altered unlawfully by DHS/CHI Program Director Richard Lewis in violation of paragraph 26 of the Settlement Agreement in *Butler, supra*; and

#(27) Exhibit 27: Letter re asthma-related prophylaxis


**Invidious actions = hostile work environment**


30. In the contexts established/alleged in paragraphs 1-29 above, including Exhibits 1-27 above, I have established/asserted that the scofflaw Defendants and the scofflaw NYC and the scofflaw NYC contractors have acted in ways that are simultaneously cruel but-not-unusual and also successful in creating an overwhelmingly hostile work environment for a vulnerable disabled elderly "client" of DHS, encompassing

(a) unlawful misconduct that creates an environment that a reasonable person would find hostile or abusive; and

(b) unlawful misconduct that caused recurring impossibility of performance in my many attempts to fulfill my predictable *pro se* litigant duties, obligations and responsibilities

(i) in *Davidson v HHC*, 1:22-cv-00764-AS-SA; and

(ii) in this action, *Davidson v OCA*; and

(iii) in *Davidson v Judicial Council of the Second Circuit*,

`1:25-cv-01226-LTS`; and

(iv) in my submitted Petition for *Certiorari* in the US Supreme Court; and

(v) in my submitted, but not yet docketed *Davidson v. City of New York*; and

(c) my oft-expressed oral and written statements explaining that I subjectively perceive the unlawful misconduct of DHS and its contractors to be hostile/abusive and purposeful discrimination based on disability; and

(d) my oft-expressed assertions that DHS and its contractors have created a hostile/abusive environment by targeting me in ways that are informed by an awareness of

(i) the vulnerabilities caused by my well-documented disabilities, and

(ii) the weaknesses of my "protected class" status. — see *Brown v. Henderson*, 257 F3d 246, 252 (2d Cir. 2001); and see *Butler, supra*; and see *Fox v. Costco Wholesale Corp.*, 918 F3d 65, 74 (2d Cir. 2019) [adopting Title VII hostile work environment test for the ADA]; and see NY Constitution at Article I, §11(b) [dismantle discrimination on the basis of disability]

31. In the contexts established/alleged in paragraphs 1-30 above and in support of the request for reconsideration per FRCP Rule 54(b)(1)(B) and FRCP Rule 9, I did all that was possible did all that was possible for me to do in order to ensure the development of a record in which the scofflaw DHS and its scofflaw contractors and

others would be able to provide this Court with an array of contemporaneous,

redundantly validating and reinforcing documentation of

(a) more than one incident which was extraordinarily severe enough to support this Court's finding that the scofflaw Defendants, the scofflaw DHS bureaucracy and the scofflaw DHS contractors, acting independently and conspiring together, successfully created a hostile work environment by targeting my disabilities — see *Knope v. Garland*, No. 20-cv-3274 (2d Cir. Nov. 9, 2021) [the elements of a hostile work environment claim are the same under the ADA, and thus, the Rehabilitation Act]

(b) more than one incident causing impossibility of performance in the process of fulfilling the Plaintiff's predictable *pro se* litigant obligations in *Davidson v HHC* and in *Davidson v OCA* and in *Davidson v Judicial Council of the Second Circuit* and in my submitted Petition for *Certiorari* in the US Supreme Court and in *Davidson v City of New York*. — see *Harris v. Forklift Sys., Inc.*, 510 US 17, 21 (1993) [objectively hostile when it "is permeated with discriminatory intimidation … that is sufficiently severe or pervasive"]

(c) serial accumulating incidents that were sufficiently continuous and concerted to have altered the conditions of the baseline environment which the Plaintiff/client needed in order to access the program and services which serial contracts accompanying the acceptance of federal financial assistance are intended to ensure, e.g.,

(i) May 2024, as documented in the records of the NYC Department of Homeless Services (DHS) and its contractor, Acacia Network (Acacia); and

(ii) July 2024, as documented in the records of DHS and Acacia; and

(iii) August 2024, as documented in the records of DHS, Acacia, the US Department of Housing and Urban Development (HUD), the NYC Department of Housing Protection and Development (HPD), the Office of the DHS Ombudsman (Ombudsman) and the NYC Coalition of the Homeless (CFTH); and

(iv) November 2024, as documented in the records of DHS, Acacia, Ombudsman, NYC City Council Member Sandy Nurse (CM Nurse), the NYC Public Advocate (NYCPA) and CFTH; and

(v) January-February 2025, as documented in the records of DHS, Acacia, Dr. Victoria Mock, CM Nurse and CFTH; and

(vi) March 2025, as documented in the records of DHS, Acacia, Dr. Victoria Mock, CM Nurse and CFTH; and

(vii) March-April 2025, as documented in the records of DHS, Acacia, HUD, HPD, the NYC Housing Authority (NYCHA), the Jewish Association Serving the Aging (JASA), CM Nurse and CFTH; and

(viii) May 2025, as documented in the records of DHS, Acacia, Community Housing Innovations (CHI), NYC City Council Member Shahana Haniff (CM Haniff) and CFTH; and

(ix) August 2025, as documented in the records of DHS, CHI, Acacia, CM Haniff and CFTH.

(x) September-October 2025, as documented in the records of DHS, Acacia, NYC City Council Member Alexa Avilés (CM Avilés) and CFTH. — see *Harris, supra* at 23 [totality of the circumstances …, including proof of the "frequency of the discriminatory conduct; its severity … and whether it

unreasonably interfered with the plaintiff's work performance"]; and see *Butler, supra*; and see *Henrietta D., supra* at 278, citing Charles Alan Wright & Arthur R. Miller, 5 Federal Practice & Procedure §1271 (2002) ["observing that the Federal Rules of Civil Procedure are designed such that a party will not bear the burden of proof on a particular point of law when the evidence needed is not typically within the party's control"]; and see NY Constitution at Article I, §11(b) [dismantle discrimination on the basis of disability]

**Invidious actions = retaliation + causing impossibility**

32. At 6 pm on Friday, August 8, 2025, I was ambushed by a inexplicably hostile agent of a scofflaw DHS contractor, Community Housing Innovations (CHI) — I was abruptly stopped on entering the DHS/CHI shelter from which I submitted the initial Complaint and IFP application in the as-yet undocketed *Davidson v City of New York*; and this DHS/CHI agent informed me in a loud, aggressive, browbeating barrage of words that

(a) I no longer had a bed or a space in the Super 8 motel on the corner of Third Avenue and President Street in the Gowanus section of Brooklyn — my permission to be in this DHS/CHI shelter was revoked without notice or good reason during the afternoon hours; and

(b) I was being **transferred to another shelter because I submitted a lawsuit against DHS/CHI in federal court** [emphasis added with *italics* and **bold**]; and

(c) I had to pack up everything I owned immediately; and

(d) I could not ask questions based on the DHS/CHI-created documentary record, because none of those written words had any validity in a context which had been defined as an "emergency" which need not be explained. — see contravention of (#3) Exhibit 3, *supra* at paragraphs 26 and 35 of ECF No. 67 in *Butler, supra.*

> ECF No. 67 in *Butler, supra.*
>
> 26. DHS staff *will not make any* **adverse determination regarding shelter benefits** in cases in which the Shelter Applicant or DHS client's **actual or perceived failure to comply relates to a disability requiring an accommodation that has not been provided**. *In the event that an accommodation has been previously provided,* **the client may request and the Agency shall consider the need for an additional or alternative accommodation prior to making an adverse determination**. [emphasis added in *italics* and **bold**]
>
> 35. <u>Non-Retaliation</u>. DHS will not retaliate or otherwise make any adverse determination regarding shelter eligibility or benefits as a result of a Class Member's request for an RA. [emphasis with <u>underlining</u> in original]

33. On August 8, when I pointed out that the DHS/CHI transfer form supported my reasonable request for an explanation of the so-called "emergency," the reply of the DHS/CHI agent caused serial cognitive cascade failures for me — contriving a

predictable inability to speak up for myself in reaction to a prolonged onslaught of loud harangues which informed me that

(a) it didn't matter what words were printed on any DHS/CHI form or anywhere else because he was only focusing on the demand that I must leave immediately; and

(b) it didn't matter what words I spoke because he was only focusing on the demand that I must leave immediately; and

(c) if I didn't pack my possessions myself, a DHS/CHI agent would throw everything I own in black trash bags — thus creating extreme hardship for me by further disrupting my vulnerable Activities of Daily Living (ADLs) and my concurrent Independent Activities of Daily Living (IADLs); and

(d) it didn't matter whether or not I understood because he was only focusing on the demand that I must leave immediately — see #(26) Exhibit 26: Form DHS-48c(E) 05/24/22 (page 1 of 5) LLF re transfer which was significantly altered by DHS/CHI Program Director Richard Lewis; and compare with #(7) Exhibit 7 in the contexts established by #(8) Exhibit 8 and #(17) Exhibit 17 and #(18-21) Exhibits 18-21; and see contravention of (#3) Exhibit 3, *supra* at paragraphs 26 and 35 of ECF No. 67 in *Butler, supra.*


34. On August 8, despite the systemic unlawful discriminatory history which informed #(7) Exhibit 7, DHS/CHI agents transferred me to one of the 50+ shelters operated by scofflaw DHS contractor Acacia Network (Acacia); and this dramatic development happened with no notice nor time for me to think it through nor time to react and

respond constructively. —  see NYC DHS re Acacia

https://www.nyc.gov/site/dhs/about/acacia-network.page

35. Late in the night of Friday, August 8, a DHS/Acacia agent in my new shelter told me she was too busy to answer any questions from me; and then she said, "Go to your room;" and so, in response to the escalating volume and the escalating anger in her voice, I stopped talking.

36. In the morning of Saturday, August 9, the same DHS/Acacia agent in paragraph 35 above said, "Of course you know you were transferred for your own safety;" and when I replied, "No, I don't know that," she turned and walked away from me; and with this abrupt withdrawal, she stopped me from asking follow-up questions.

37. In the afternoon of Saturday, August 9, I went to the Pacific Branch of the Brooklyn Public Library where I began drafting my Amended Complaint and my motion for expedited service of the named Defendants in *Davidson v City of New York*.

38. At night on August 9, I was required to vacate a quiet environment with a quiet roommate in a room with a cooling/heating unit with filters I could reach for cleaning each day, and this is very important to me important because of the life-threatening asthma-related experiences caused by DHS/Acacia in the shelter I somehow managed to survive in the Brownsville section of Brooklyn; and instead, I was required to move to an another basement room which was worse in every way — relocated to a place which targeted an array of well-documented specifics which I'd explained many times;

and these red flag conditions had been repeatedly identified in letters I'd submitted from my doctors, e.g.,

(a) this street-facing room is the noisiest in the shelter because men daily congregate from 8am through midnight in front of the ground-level window, sometimes sitting on the window sill, sometimes playing loud music, sometimes talking loudly; and

(b) the WiFi which functions elsewhere in the building doesn't work at all in the basement; and

(c) my new roommate tells me he has a long history of trouble with everyone he's ever had as a roommate in DHS shelters in Brooklyn; and

(d) the small space has a smell of mildew, and this irritant causes pulmonary distress for me because of asthma; and nevertheless, my new roommate rejected my need to use the fan in the bathroom to draw out airborne irritants which cause breathing difficulties for me; and

(e) my new roommate refuses to acknowledge that I have asthma, even after I provided him with a copy of a letter from my pulmonary specialist, and this is because Dr. Mudd's name is not on the stationary of the Mount Sinai National Jewish Respiratory Institute; and

(f) the cooling/heating unit for this room is mounted flush with the ceiling; and because of its awkward location, the cleaning staff informs me that the unit's filters are never cleaned because a ladder would be necessary — in other words, this means that my pulmonary problems are made worse every time the air conditioning is turned on in hot weather.

26

39. In the morning of Sunday, August 10, a DHS/Acacia agent in the Program Office refused to tell me her name or her job title; and so, in response to the escalating volume and the escalating anger in her voice, I stopped talking.

40. In the morning of Sunday, August 10, my efforts to make the best of a bad situation were again frustrated:

(a) DHS/Acacia agent Shana Lewis refused to acknowledge my request for reasonable accommodation by simply permitting me to sit on my rollator in a quiet hallway where the WiFi was accessible; moreover, she refused to look at the proffered paper copies of support letters from my doctors which I had with me in the rollator's under-seat pouch; and instead, with escalating volume and with escalating anger in her voice, she said,

(i) "You've only come here to create chaos for us;" and

(ii) "***This is a DHS problem, nothing to do with us***" [emphasis added with *italics* and **bold**]; and

(b) then the same DHS/Acacia agent identified in paragraphs 35 and 36 intervened with escalating volume and escalating anger in her voice; and she said,

(i) "He went to the library yesterday, so he can go to the library again today;" and

(ii) "You shouldn't give him any more time:" and

 (c) then a third DHS/Acacia agent intervened with escalating volume and escalating anger in his voice; and he said,

(i) "I'm **_losing patience with your talk about federal law_**" [emphasis added with _italics_ and **bold**]; and

(ii) "**_We don't know anything about the accommodations you're talking about, and we're not listening any more_**." [emphasis added with _italics_ and **bold**] — see contravention of (#3) Exhibit 3, _supra_ at paragraphs 26 and 35 of ECF No. 67 in _Butler, supra._

41. In the afternoon of Sunday, August 10, I used my rollator to walk to the Costco Pharmacy in Sunset Park where I began drafting the Affirmation in support of my motion for urgent service on Defendants as a form of injunctive relief in _Davidson v City of New York_

42. In the morning of Monday, August 11, I sought help from CFTH, and I was told by Crisis Intervention Advocate Maya Sullivan that nothing could be done because 48 hours had elapsed since the "emergency" transfer; and in futile response, I explained that this transfer had been orchestrated by DHS/CHI will full understanding that there was no realistic/practical/actual option for me to do anything until Monday morning because

(a) the DHS Ombudsman office was closed for the weekend at the time of this ambush; and

(b) the CFTH "crisis" office was closed; and

(c) NYC Council Member (CM) Haniff's offices were closed; and

(d) CM Nurse's offices were closed; and

(e) outreach to the CFTH telephone hotline or writing to CFTH via e-mail has proven to be futile since May 2024; and

(f) the *ante hoc* investment of time, hope, questions and attempts to create back-up plans for unlawful discriminatory emergencies such as this were unavailing except for whatever records the DHS Ombudsman, CFTH, CM Nurse and CM Hanif may have created. — see *Hamer, supra* in contexts established/alleged in paragraphs 1-40 above; and see (#3) Exhibit 3, *supra* at paragraphs 26 and 35 of ECF No. 67 in *Butler, supra.*

43. In the afternoons of August 11-31, I went to the Gowanus Whole Foods where I worked on editing my Amended Complaint, editing the Motion for Urgent Injunctive Relief, editing my Affirmation in Support of the Motion, and drafting a Memorandum of Law in Support of the Motion in *Davidson v City of New York*.

44. The time-lag between the submission of the existentially necessary and urgent *Davidson v New York* and the docketing of this affirmation was predictably caused by the systemic unlawful discrimination based on disability and specific exacerbating misconduct by scofflaw DHS and its scofflaw contractors in the confluence of

(a) my executive function neurological disabilities; and

(b) the accretion of repeated and successful patterns and practices of intimidation, harassment and purposeful exacerbation of the deficits associated with my known disabilities, e.g.,

(i) no *post hoc* pretext can excuse/justify the dramatic intrusion of the hostile DHS/Acacia agent identified in paragraph 39 above when she came

into my room as I was taking a shower on Sunday, October 19, 2025 at approximately 9:05 a.m.; and in reply to "I'm in the shower now — wait a minute," she retorted angrily, "I can do whatever I want" as she stood for a while in the room; and then, without explanation, she walked away; and (ii) no *post hoc* pretext can excuse/justify the dramatic intrusion of the hostile DHS/Acacia agent identified in paragraph 35-36 and 40(b) above when she came into my room while I was asleep at 1:30 a.m. approximately two weeks ago; and in the context of an onslaught of fast-paced verbage in an over-loud, anger-edged voice in which ramped up in volume over the course of approximately 25 minutes, I heard her say over and over again that she didn't know what I was talking about as I repeatedly asked her to look at what's written about me in the online CARES inventory. — see 28 CFR §35.108(d)(2)(iii)(K) [predictable assessments], in the context established by (#3) Exhibit 3, *supra* at paragraph 36 in the Settlement Agreement (ECF No. 67) in *Butler, supra*

36. <u>CARES Database</u>. …RAs requiring ongoing accommodations that have been requested or granted will be entered into CARES or an equivalent database accessible to relevant staff interacting with the Class Member **to ensure that any granted RAs follow the Class Member. RA requests that are pending or have been granted will be visible in CARES or an equivalent database for anyone accessing that Class Member's case record in a manner that is readily apparent**.  [emphasis with <u>underlining</u> in original; emphasis added with *italics* and **bold**]

45. In the context established/alleged by paragraphs 35-44 above, the patterns and practices of systemic unlawful discrimination and interference with protected rights are purposeful, and DHS/Acacia Program Director Myrriah McIntosh is ultimately responsible; moreover, the hostile underlying DHS/Acacia corporate culture was made clear by the reaction of Ms. McIntosh when I mentioned *Butler, supra* and NYC Local Law 12 of 2023 — and I was unsurprised when she claimed that she knew nothing about *Butler* nor about any NYC Local Laws, and in fact, every other scofflaw DHS agent and scofflaw DHS contractor agent has said the same to me over and over since 2019.

46. In the context established/alleged by paragraphs 35-45 above, Ms. Mcintosh was not only offended by my expectation that she knew or should have known about *Butler* and Local Law 12 — she was indignant when I tried to explain to her that DHS and the leadership of Acacia's bureaucracy had prophylactic and affirmative duties to ensure, before any homeless person with disabilities walked through the door of the Sunset Park shelter, that she and her staff had been trained repeatedly to know all about these anti-discrimination baselines.

47. In the context established/alleged by paragraphs 1-46 above, I have provided evidence to support the reasonable vacatur of ECF No. 148 per FRCP Rule 54(b)(1)(B) and FRCP 9 because I have shown how the scofflaw Defendants and other scofflaw recipients of federal financial assistance conspired together to cause perversely hostile

work environments and serial government-contrived impossibility of performance based on systematic unlawful discrimination based on disability.

## RELIEF

48.  I seek to mitigate the adverse consequences of impossibility of performance created for me by the actions and inaction of scofflaw Defendants and the non-party, non-federal scofflaw recipients of federal financial assistance within the geographic boundaries of NY and NYC — not excluding the continuing systemic discriminatory barriers which block meaningful program access for a litigant with communication disabilities in the Roosevelt, Moynihan and Marshall Courthouses.

49.  I seek to undo the harm ECF No. 148 caused by its summary rejection — denial without reading or considering the sentences written by me in ECF No. 146.

Dated: October 24, 2025          Respectfully submitted,
      New York, New Yo

                    /s/ Ronald Davidson

                    Ronald Davidson
                    353 38th Street
                    New York, New York 11232
                    929-446-5096
                    ron.center2019@gmail.com